## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

GUSTAVO CORREA SABOGAL,

    Petitioner,

    v.                                                           Civil Action No. TDC-15-0448

MARISA JULIA PAULA VELARDE,

    Respondent.

### MEMORANDUM OPINION

When a parent flees to another country with a child in contravention of the other parent's custody rights, the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501, generally requires the child's immediate return so that custody rights can be determined in the child's country of habitual residence. In this case, Gustavo Correa Sabogal ("Correa") alleges that his wife, Marisa Julia Paula Velarde ("Velarde"), from whom he is separated, wrongfully removed their two minor children, J.G.C.V. and R.G.C.V. (the "Children"), from their native country of Peru to the United States. He has filed a Petition under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 9001 *et seq.* (2012), seeking their return to Peru under the Hague Convention. Upon consideration of the Petition, the submitted briefs, and the evidence admitted during a four-day bench trial, the Petition is CONDITIONALLY GRANTED.

### PROCEDURAL HISTORY

On February 17, 2015, Correa filed his Petition, accompanied by a request for an "emergent *ex parte* hearing" on the Petition and an order to show cause that would bar Velarde

from removing the children during the pendency of the proceedings and requiring Velarde to appear. When Velarde filed a response to the Petition on February 19, the Court denied the request for an *ex parte* hearing but ordered that the Children remain within the jurisdiction of the Court during the pendency of the proceedings. At that time, the parties were engaged in previously filed litigation in the Circuit Court of Montgomery County, Maryland, arising from both parents' efforts to register Peruvian child custody determinations in their favor under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), Md. Code Ann., Fam. Law § 9.5-101 *et seq.* (West 2015). Although a trial on those matters was scheduled for April 13, 2015, the parties agreed to stay those proceedings pending the resolution of the Petition. With the parties' consent, the Court scheduled a bench trial on the Petition to start on April 20, 2015. Following the bench trial, the Court ordered the parties to submit any proposed undertakings, accompanied by any relevant evidentiary or legal support.

## FINDINGS OF FACT

During the four-day proceeding, the Court heard fact testimony from Correa; Velarde; Daniel Francisco Vigo Parra ("Vigo"), Correa's former security guard and domestic employee; and Elizabeth Benitz ("Benitz"), who supervised visitations between Correa and the Children after they arrived in the United States. The Court heard expert testimony from Carlton E. Munson, Ph.D. ("Dr. Munson"), who conducted psychological evaluations of Velarde and the Children, and John T. Lefkowits, Ph.D. ("Dr. Lefkowits"), who conducted a psychological evaluation of Correa. Several witnesses testified as experts on Peruvian law, including Liliana Garcia-Bustamante Collantes ("Bustamante") (family law), Miguel Grau (constitutional law), Roberto Carlos Pereira Chumbe (criminal and privacy law), and Gustavo Seminano (privacy

law). The Court also admitted numerous exhibits in evidence, including affidavits from Gino Bisso Aguirre ("Bisso") and Omar Taboada, both of whom are employees of Correa.[1]

As one might expect, the parties presented accounts that conflicted in many respects. In particular, there were significant discrepancies between the testimony of Vigo, who testified that he witnessed and heard verbal and psychological abuse by Correa against Velarde and the Children, and Correa, who denied most of Vigo's testimony. Counsel for Correa established on cross-examination that Velarde's family has been paying Vigo the same salary that Correa used to pay him in order to keep him available to testify during the pendency of this case, and that Velarde's family had paid for an attorney for Vigo and for his travel expenses. Nevertheless, having observed the witnesses during the testimony, the Court finds Vigo's testimony to be credible, based on his demeanor and forthright manner in responding to questions, his undisputed testimony that he came forward to the Velarde family on his own because of his concern about the abuse, and his candid acknowledgment of the arrangements made with Velarde's family.

In contrast, the Court has significant concerns about the credibility of Correa. Because he was called by both parties at different points during the bench trial, Correa took the stand three different times. During his first testimony, he appeared arrogant and indignant, accused Velarde of refusing to visit the Children while they resided with him, and summarily denied key facts, such as his prior mental health treatment. But when called to testify following Vigo's damaging testimony, he dramatically altered his presentation to appear contrite and remorseful for mistreating his wife and admitted to undergoing alcohol and drug rehabilitation, yet continued to deny the key elements of Vigo's testimony and launched into defensive monologues. Given this

---

[1] The Court did not interview the Children. At the end of the hearing, both parties opposed having the Children interviewed and waived any argument that the Children should be interviewed to resolve this dispute.

erratic and self-contradictory presentation, the Court has difficulty relying on his testimony and credits the testimony of Velarde and Vigo on the key elements of verbal and psychological abuse.

Based on all of the evidence presented, testimonial and documentary, the Court finds the following facts:

## I.    2003 – 2012: The Marriage and Separation

Correa and Velarde were married in 2003 and resided primarily in San Isidro, a district of Lima, Peru.  They have two children, J.G.C.V., born in 2005, and R.G.C.V., born in 2007. Correa is a businessman who makes frequent trips to a farm outside of Lima that he owns and operates.  During their marriage, Velarde was a homemaker; she is now studying for a Master's Degree in Business Administration.  The maternal and paternal grandparents live nearby in Lima.

There were no notable problems with the marriage until 2008, when Velarde found a handpicked suit laid out on their bed with a note from Correa asking to be buried in the suit if he died in a car accident.  At Velarde's urging, Correa sought and obtained psychiatric treatment for two years.  In 2010, however, Correa stopped his psychiatric treatment and was noticeably abusing alcohol and drugs.  From that time forward, he drank heavily, consuming vodka and orange juice in the morning before retiring to his office to drink throughout the day.  Sometimes, Correa concealed the vodka in a coffee cup.  He also took prescription medications while under the influence of alcohol: Clonazepam (Rivotril), used to treat seizures and panic disorders;

Diazepam, used to treat anxiety disorders, alcohol withdrawal, muscle spasms, and convulsive disorders; and Atacand, used to treat hypertension.[2]

Under the influence of alcohol and prescription drugs, Correa was verbally aggressive and psychologically abusive. With the Children present, Correa would call Velarde a "bitch" and a "whore." Trial 10:04:25 (Apr. 24, 2015). He threatened her life in several ways. He told Velarde that she "would live with a bullet in her head." *Id.* at 10:04:45. He told her, in front of the Children, that he was going to "eviscerate" her face, that he would "destroy" her, and that she would be living alone on the street. *Id.* at 10:09:40. At another point, Correa stuck a knife in a table as a threat to Velarde.

He also threatened to harm himself and the Children. In 2012, while drinking and with the Children in the room, Correa threatened to throw himself out of the fifth-floor window of the building in which they lived. At another point, he stated that, "If things go wrong, I will kill the boys and myself." Trial 10:04:55 (Apr. 24, 2015). On December 28, 2012, no longer able to take the abuse, Velarde separated from Correa and took the Children to live at her parents' beach house in Peru.

## II.     December 2012 – June 2013:  Velarde Retains the Children

After the separation, Velarde allowed Correa to talk to the Children over the phone. She occasionally permitted him to see the Children for a few hours during the week at a shopping mall in her presence, and for a full day on the weekend at the home of Correa's parents. On one occasion, at the end of February 2013, Velarde allowed the Children to stay overnight with

---

[2] Per Velarde's request at trial, the Court takes judicial notice of the descriptions of these medications in the *Physician's Desk Reference*, *available at* http://www.pdr.net (last visited May 18, 2015). *See United States v. Howard*, 381 F.3d 873, 880 (7th Cir. 2004) (taking judicial notice of medical facts in the *Physician's Desk Reference*); *Cunningham v. Scibana*, 259 F.3d 303, 304 (4th Cir. 2001) (relying on a *Physician's Desk Reference* pharmaceutical description).

Correa at his parents' house. Velarde was comfortable with such arrangements because the Children's nanny always accompanied them on these visits, Correa's parents were present during the weekend visits, and Correa told her that he had been seeing a psychiatrist.

Between April and June 2013, Correa sent Velarde a series of aggressive, abusive emails. On April 25, he wrote to her that she would be receiving a demand for divorce, told her that he was filing criminal complaints against her parents and sister, and threatened that his family would "pay all the millions possible" to ensure that he received custody of the Children. Trial Ex. 107, at 290. He also wrote that "your mother's private life will be put out in the open in accordance with the law, and she'll have to bear the shame of her adulterous acts," and that Velarde is "a manipulated brute, a provincial woman who is not good for me." *Id.* at 291. He noted that "Lima is full of spectacular women," and warned, "You want war, you'll get war." *Id.* On April 28, he wrote to Velarde that he was seeing a psychiatrist every week and that he had not had alcohol in five months. Nevertheless, he wrote that she was "acting like a bitch with no feelings," warned her to "get ready because we're going to rip the soul from your shyster lesbian lawyers," and added, "Thank God this world is moved by money and in that you're lost. All of you get ready. You hurt me and now I'll shred you to bits." Trial Ex. 108, at 295. On June 10, Correa wrote that Velarde was "leading a promiscuous life with my children in front of your parents," called her a "slut," and warned, "I AM CAPABLE OF ANYTHING." Trial Ex. 110, at 301 (emphasis in original). In a separate message, he wrote, "keep gathering false evidence and for the babies, you're going to end up in jail. Get ready a real hell is coming for you and your family." Trial Ex. 109, at 298. During this time frame, Correa also spoke to Velarde by telephone and repeatedly screamed insults at her and her family, including that she was a "fucking bitch" and a "daughter of a whore," that her father is a "son of a bastard bitch," and that

her mother is "a stupid whore" and a "fucking whore." Trial Ex. 114. He also threatened her father and her parents, shouting that he would "kick the shit out of him" and "I swear to God I'll kill them." *Id.*

On June 16, after Velarde allowed the Children to spend Father's Day with Correa, he sent an email thanking her, but then claimed that it had been "revealed" to him that someone known to Velarde would suffer tragedies in the coming year: a teenage child would die in a car accident, and other relatives would die of cancer and a heart problem during the year. Trial Ex. 111, at 306.

## III.    June 2013 – October 2013:  Correa Retains the Children

On June 17, 2013, Velarde allowed the Children to visit Correa again to see a puppy he had bought. Correa did not return the Children. When Velarde attempted to visit the Children, Correa instructed his staff to tell her that the Children were not there and to get her out any way they could. On one occasion, when she attempted to visit, Correa shouted at Velarde from the fifth-floor balcony to leave and, in front of the Children and loud enough for the neighbors to hear, called her a "masturbator of kids," and shouted, "You stuck your finger in the ass of the boy." Trial 10:20:00 (Apr. 24, 2015). When Velarde called, if he did not want the Children to talk to Velarde, Correa unplugged the phones.

On July 1, 2013, Velarde obtained a *habeas corpus* order from the Tenth Criminal Court in Lima ordering Correa to give Velarde regular access to the Children. The court explained that Correa had been preventing Velarde from exercising her parental authority and ordered him to stop.[3] On July 3, 2013, Velarde filed a complaint in the Tenth Family Court of Lima seeking

---

[3] As explained in more detail below, under Peruvian law, "parental authority" encompasses the rights and responsibilities of parents as they relate to their minor children. *See infra* Discussion Part II.A.

legal custody of the Children. On August 23, 2013, she submitted a petition for interim relief seeking temporary custody during the pendency of the proceedings.

Following the *habeas corpus* order, Velarde saw the Children five times, each time accompanied by her sister, Correa's sister, or a friend of Correa. During these visits, which lasted for one to two hours at a time, the Children appeared to her to be distant and scared. Correa would often be in his home office within eyesight, and he would gesture at the Children to prevent them from talking. Correa monitored the visits with a camera that he installed in the room. Despite these visits, during the period from July to October 2013, Correa sent Velarde approximately eight notarized letters, in which he purported to invite Correa to visit the Children but also claimed that she either would not visit or would come to the door but refuse to enter, causing distress to the Children. In one such letter, dated September 6, 2013, Correa reverted to verbally abusing Velarde, stating, "To have to deal with you disgusts me," referring to her as being "typical of dumb and repetitive women," calling her family "trash," and accusing her of being a "sex offender." Trial Ex. 41 at 696–97.

During the months when the Children lived with Correa, his psychologically abusive behavior grew worse as he continued to abuse alcohol, consuming up to three full glasses of vodka while taking pills daily. He repeatedly told the Children that he would harm their mother. At one point, Correa bent a fork in front of the Children and told them, "This is what I'm going to do to your mother when I see her." Vigo Test. 10:1–2, Apr. 23, 2015. He demonstrated to the Children, with a Taser held to his neck, how he would use the Taser on Velarde if she ever tried to take them away, and he talked to them about buying a silencer for a handgun that he kept in the house. The silencer, he mused, would be used to kill Velarde.

8

Correa engaged the Children in sexually explicit discussions in his efforts to portray Velarde as a child abuser. For several months, Correa referred to Velarde as a "prostitute" when speaking to the Children. Vigo Test. (Direct) 78:17–18, Apr. 21, 2015. He told the Children that she "wants the penis to be stuck in her vagina and your grandmother is like that, too." *Id.* at 78:18–20. He told them that "your mother has stuck her finger in your ass." *Id.* at 78:20–21. Correa coached the Children on what to tell social workers who came to the house, particularly instructing J.G.C.V. to say that Velarde had touched him inappropriately. J.G.C.V. did as instructed.

Correa went further and compelled them to participate in his verbal abuse of their mother and to use vulgar and sexually explicit language in doing so. Correa ordered R.G.C.V. to call his mother a "dog" or a "bitch." *Id.* at 75:11–15, 77:12–15, 91:23–92:2. When he struggled to say the words, Correa insisted that he say them. On another occasion, he compelled J.G.C.V. to write a message that he dictated, to be sent to Velarde, stating that she had raped him, that her father is a "drunkard," that her mother is a "deceitful whore," and that the Children both "hate" her. J.G.C.V. was also instructed to write that Correa would rather "kill himself," and that the Children "would rather die and go to Heaven as angels with Uncle Guillermo," than have them go back to living with her. Vigo Test. (Direct) 17:22–25, Apr. 23, 2015; Trial Ex. 115, at 275. Guillermo is Correa's deceased brother.

Correa also discussed death directly with the Children, including threatening to kill them. At one point, Correa told the Children, "Nothing will ever separate us. First, I will kill you both and then I will kill myself and we will all go together to heaven with Uncle Guillermo." Vigo Test. (Direct) 4:25–85:3, Apr. 21, 2015. On another occasion, when R.G.C.V. had a fever,

Correa told him that he was going to die. R.G.C.V. became so fearful that Vigo had to calm him down.

There was one occasion when Correa turned violent. One day, when J.G.C.V. returned home with bad grades, Correa threw a large book at him that struck him in the face and broke open his lip.

## IV.     October 2013 – Present:  Velarde Regains the Children and Departs Peru

Both parties appealed the July 2013 *habeas corpus* order: Velarde on the ground that the order did not require the return of the Children to her, and Correa on the ground that the judge should not have granted the order at all. On October 17, 2013, the Court of Appeals of Lima affirmed the lower court ruling that Correa must "immediately stop preventing [Velarde] from fully exercising her parental rights," and further ordered that the Children be returned to Velarde so that "the situation be reinstated to its condition prior to" Correa taking physical custody of the Children on June 17. Trial Ex. 7, at 206, 207. On November 21, 2013, in response to Velarde's earlier petition for temporary custody, the Family Court issued a *no innovar*, a Peruvian injunction order, in which it ordered the "preservation of the *de facto* situation," effectively endorsing Velarde's temporary custody over the Children. Trial Ex. 8, at 260.

The Children were returned to Velarde as they arrived home from school on October 29, 2013. Correa could not bear to watch the exchange. He sat on the floor inside the family home with a glass of vodka and asked Vigo if he had his gun. When Vigo said that he did, he offered to pay Vigo to kill his wife. Correa then applied eye makeup to his face and climbed into bed. Later that evening, Correa's relatives arranged to have Correa forcibly transferred to a rehabilitation clinic, where he stayed until November 2013.

10

After Correa left the clinic, he moved to his parents' house in the La Molina district of Lima. Every day, Correa called Velarde's parents' home, where he believed Velarde and the Children were staying, but was repeatedly told that they were not home. He received the same response when he visited in person. Correa even asked one of his employees, Bisso, to walk the beach near Velarde's parents' beach house to see if he could find them. Correa also wrote a series of notarized letters to Velarde asking to visit the Children and, when the letters were returned to him, to her parents asking for the Children's whereabouts. On February 2, 2014, Correa filed a police complaint in order to have an officer go to Velarde's parents' residence to ask for the Children. During this time frame, Velarde and the Children were staying at a "safe house" rented by Velarde outside Lima. Even though she was apparently in hiding, she filed a series of police complaints alleging that Correa was not making efforts to see the Children.

In the meantime, Correa continued to pay the Children's health insurance and private school tuition, even though they had not been attending school. He emailed the school to see if the Children had transferred elsewhere. On February 20, 2014, Velarde took the Children to the United States. She did not inform Correa. He was not aware that Velarde left the country with the Children until June 2014, when he was notified after she had applied for an order recognizing her custody rights over the Children in the Circuit Court for Montgomery County, Maryland.

While Velarde and the Children were in Maryland, Correa sought to enlist the Peruvian legal system to assist in regaining custody of the children. On October 1, 2014, the Court of Appeals for Lima with jurisdiction over family matters granted Correa's appeal of an earlier Family Court decision and granted him temporary custody of the Children. Correa also filed a complaint seeking criminal charges against Velarde for leaving the country with the Children

11

without his permission.  Although the complaint was initially dismissed, a Peruvian appellate court reinstated the complaint on January 9, 2015, allowing the investigation to proceed.

Vigo testified that, during this period, he heard Correa directing his attorney to "not hold back" and to "go ahead and pay whatever amount of bribe was needed."  Vigo Test. (Direct) 27:19–20, Apr. 23, 2015.  Vigo took photographs of pages of Correa's payment ledger, which contains entries for payments for items such as "secretaries of the 10th Family Court of Lima," for "revocation of injunction in Family Court," and "for arranging criminal and family courts."  Trial Ex. 120, at 133, 134, 137.

In January 2015, the Montgomery County Circuit Court granted Correa supervised visitation sessions with the Children three days a week.  On January 27, 2015, in Maryland, Correa saw the Children for the first time since they were returned to Velarde in October 2013. The Children were initially apprehensive but eventually warmed up to their father.  They have been meeting regularly since January 2015, and the Children have not exhibited any fear or anxiety toward Correa during the supervised visitations.  While in the United States, Velarde had the Children evaluated by Dr. Munson, a licensed clinical social worker and professor at the University of Maryland School of Social Work, who diagnosed J.G.C.V. with severe post-traumatic stress disorder and persistent depressive disorder.  He diagnosed R.G.C.V. with severe anxiety disorder and reached a "rule out" finding of post-traumatic stress disorder and persistent depressive order, which means that he believes there is a likelihood that R.G.C.V. has these disorders.  Both of the Children were diagnosed with separation anxiety disorder, through which the Children are at risk of being distressed if separated from Velarde.  Dr. Munson concluded that removing the Children from Velarde and returning them to their father in Peru would present a "grave risk" of psychological harm.  Dr. Munson Test. (Direct) 135:20–136:9, Apr. 23, 2015.

12

In the same time frame, Dr. Lefkowits evaluated Correa in the United States. He concluded that Correa's alcohol abuse was in a sustained remission and that Correa otherwise had no other diagnosable disorders, but found a likelihood ("rule out") of adjustment disorder with mixed depression. Dr. Lefkowits noted, however, that Correa's responses during the evaluation were "mildly to moderately defensive," reflected in part by a computerized test result indicating that Correa's responses indicated "an extreme attempt . . . to present himself as being free of psychological problems in order to influence the outcome of the custody evaluation." Dr. Lefkowits Test. (Cross) 13:9–15, Apr. 24, 2015. Dr. Munson testified that such defensiveness occurs when someone tries to fake a positive impression or presents an overly positive picture of himself and his functioning.

## DISCUSSION

### I.    Legal Standard

The Hague Convention, to which the United States and Peru are signatory parties, is a multilateral treaty designed "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and . . . to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention art. 1. It is meant "to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (citation and internal quotation marks omitted).

The United States has implemented the Hague Convention by statute in ICARA. To secure the return of an abducted child under ICARA, a petitioner must prove, by a preponderance of the evidence, that the child was "wrongfully removed" under the meaning of the Hague Convention.  22 U.S.C. § 9003(e)(1)(A).  If the petitioner establishes wrongful

13

removal, the respondent must return the child unless the respondent can show that an exception applies under the Hague Convention. *See Miller*, 240 F.3d at 398. Here, Velarde asserts that three exceptions apply. The first exception, which must be established by a preponderance of the evidence, is that the petitioner "was not actually exercising the custody rights at the time of removal." Hague Convention art. 13(a), 19 I.L.M. at 1502. The second, under Article 13(b) of the Hague Convention, is that there is a "grave risk" that return would expose the Children to "physical or psychological harm or otherwise place [the Children] in an intolerable situation." Hague Convention art. 13(b), 19 I.L.M. at 1502. The third, under Article 20, is that the return "would not be permitted by the fundamental principles of the [United States] relating to the protection of human rights and fundamental freedoms." *Id.*, art. 20, 19 I.L.M. at 1503. The Article 13(b) and Article 20 exceptions must be shown by clear and convincing evidence. *Miller*, 240 F.3d at 398.

## II.    Wrongful Removal

Removal is "wrongful" under the Hague Convention where: (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal, (2) the removal violated the petitioner's custody rights under the law of the home country, and (3) the petitioner had been exercising those rights at the time of removal. *Bader v. Kramer* (*Bader II*), 484 F.3d 666, 668 (4th Cir. 2007) (citation omitted). The parties do not dispute that the Children were habitually resident in Peru and that Velarde removed the Children from Peru on February 20, 2014. At issue here is whether Correa had custody rights under Peruvian law following the issuance of the Peruvian court orders requiring him to return the Children to Velarde in October 2013, and whether Correa was exercising those rights at the time of removal. Based on the evidence

presented at trial, the Court concludes that Correa had custody rights and was exercising those rights at the time of removal.

### A. Custody Rights

The Hague Convention defines custody rights as the "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention art. 5(a). The analysis is based on the custody status at the time of the alleged wrongful removal. *See White v. White*, 718 F.3d 300, 307 (4th Cir. 2013); *Miller*, 240 F.3d at 401. The Court heard expert testimony on Peruvian family law from Bustamante, who stated that, at the moment a child is born, Peruvian law grants each biological parent custody rights in the form of *patria potestas.* This Roman law concept, which originally referred to the absolute authority of the father over his child, generally refers to the rights of both biological parents to exercise authority over their children. *See Whallon v. Lynn*, 230 F.3d 450, 456–57 (1st Cir. 2000). *Patria potestas* is codified in Peruvian law under the term "parental authority," which is defined as the right and duty of the parents to take care of the person and property of their minor children. Civil Code of Peru § 418.[4] In addition to providing rights and duties relating to the development, education, and assets of a child, parental authority gives parents the right to "[k]eep the children with them and appeal to the proper authority in order to recover them," which necessarily implies rights relating to the child's residence. Code of Children and Adolescents of Peru art. 74(e). Such *patria potestas* rights, which Correa received when the

---

[4] In addition to the testimony presented during the bench trial by Bustamante, the parties submitted translations of Peruvian civil and family law as attachments to the Petition, as part of Bustamante's expert report referenced at trial, and as an exhibit admitted during the bench trial. Although not all of these documents were formally admitted at trial, the Court may consider them in determining Peruvian law. *See* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.").

Children were born, are recognized as "rights of custody" within the meaning of the Hague Convention. *See Whallon*, 230 F.3d at 459 (holding that *patria potestas* rights under Mexican law are custody rights under the Hague Convention). *Cf. Bader v. Kramer*, 445 F.3d 346, 350 (4th Cir. 2006) (holding that German law presumptively confers joint custody upon both parents until a court enters a contrary order).

During a marriage, the parents jointly exercise parental authority. Civil Code of Peru § 419. The Code of Children and Adolescents of Peru, which is distinct from the Civil Code, outlines the circumstances under which parental authority can be suspended. Although parental authority may be suspended if the parents separate and divorce, Code of Children and Adolescents of Peru art. 75(g), "[i]n cases of conventional separation and subsequent divorce, neither father or mother is suspended its parental authority." *Id.* art. 76. Bustamante testified that, in such instances, parental authority can only be suspended through a legal proceeding and with a court order that expressly suspends those rights. Although Velarde and Correa had separated, no judge had ordered the suspension of either party's parental authority over the Children at the time of removal. *See Bader v. Kramer* (*Bader I*), 445 F.3d 346, 351 (4th Cir. 2006) (concluding that a father seeking the return of his daughter retained joint custody rights "because no competent German court has entered an order granting [the mother] sole custody"). *Cf. Fawcett v. McRoberts*, 326 F.3d 491, 499 (4th Cir. 2003) (holding that when a Scottish court issued a decree modifying parental rights and rescinding the right to determine the child's residence, the parent had no custody rights under the Hague Convention), *abrogated on other grounds by Abbott v. Abbott*, 560 U.S. 1 (2010).

Velarde argues that the *habeas corpus* and *no innovar* orders extinguished Correa's parental authority rights. That argument is unpersuasive. The original *habeas corpus* order

16

issued by the Tenth Criminal Court of Peru directed Correa "to immediately stop preventing [Velarde] from fully exercising her parent authority," and ordered him to allow Velarde to have regular contact with the Children. Trial Ex. 7, at 200. That order recognized that both parents had parental authority and directed one – Correa – to stop interfering with the rights of the other – Velarde. On appeal, the Court of Appeals of Lima affirmed and further required that "the situation be reinstated to its condition prior to the date on which the writ of habeas corpus was filed," meaning "when [the Children] were under the care of their mother." *Id.* at 206. The court ordered that Correa "immediately deliver" the Children to her. *Id.* at 207. But in effectively providing Velarde with temporary custody pending a final determination by the Family Court, the appellate order explicitly did not remove Correa's parental rights. Rather, it stated, "The orders do not imply any decision on who shall exercise parental authority, a fact that is being heard before another jurisdictional body, after the facts claimed herein." *Id.* at 206.

The *no innovar* order likewise failed to abrogate Correa's custody rights. In Peru, a *no innovar* order, similar to an injunction under American law, is primarily used "preserve the de facto or de jure situation." Trial Ex. 8, at 258. Here, Velarde had pursued relief in both the Family Court, where she sought an order of temporary custody, and the Criminal Court, where she sought the *habeas corpus* order. Once the *habeas corpus* order required the return of the Children to Velarde, such that she effectively had temporary custody, the Family Court issued the *no innovar* order as another means by which to "preserv[e] the de facto situation," but it explicitly referred to the order as "interim relief." *Id.* at 258–60. The court did not make any final determination on parental authority and noted that the custody proceeding was "currently in progress." *Id.* at 259. The habeas corpus and *no innovar* orders therefore did not extinguish Correa's parental authority.

17

Finally, in addition to *patria potestas* rights under Peru's parental authority law, Correa had an additional basis for custody rights under the Hague Convention because Peruvian law requires the authorization of both parents before a child may leave Peru. The Supreme Court of the United States has held that when a parent has the legal right to require that the other parent secure his or her consent to a child's removal from the country, known as a *ne exeat* right, such a right constitutes a custody right under the Hague Convention. *See Abbott v. Abbott*, 560 U.S. 1, 15–16 (2010). Under the Code of Children and Adolescents of Peru, "the notarial certified authorization of both parents is mandatorily required" for a child to travel abroad. Code of Children and Adolescents of Peru art. 111. As Bustamante testified, based on this provision, Velarde could not remove the Children without Correa's authorization or a court order. It therefore confers on Correa and other parents in Peru a *ne exeat* right, which in turn constitutes a right of custody under the Hague Convention. *Abbott*, 560 U.S. at 16. Thus, Correa unquestionably had custody rights at the time of removal.

### B.      Exercising Custody Rights

Article 3 of the Hague Convention requires the parent seeking relief to show that the custody rights "were actually exercised" at the time of removal. Hague Convention art. 3(b), 19 I.L.M. at 1501. Conversely, the opposing parent may defeat a Hague Convention petition by establishing by a preponderance of the evidence that the custody rights were not actually exercised at the time of removal. *Id.*, art. 13(a), 19 I.L.M. at 1502; 22 U.S.C. § 9003(e)(2)(B). Courts "liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Bader II*, 484 F.3d at 671; *see also Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012); *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996). Under this approach, a parent with custody rights cannot fail to exercise

18

those rights short of "acts that constitute clear and unequivocal abandonment of the child." *Bader II*, 484 F.3d at 671 (quoting *Friedrich*, 78 F.3d at 1066) (internal quotation marks omitted).   Courts have found "exercise" in cases where, in addition to paying child support, a father had physical custody of the child on at least three occasions during a three-month period, *see Bader II*, 484 F.3d at 671, and where a father kept in regular contact with his daughter over the telephone and via Skype and requested visitation rights and custody during vacations, *Walker*, 701 F.3d at 1121–22.  The broad definition of "exercise" is necessary, in part, because a determination on the adequacy of one parent's exercise of custodial rights comes "dangerously close" to the merits of the custody dispute, which the Hague Convention forbids a court from deciding.  *Friedrich*, 78 F.3d at 1065.

In this case, there is ample evidence that Correa was exercising his custody rights at the time of removal on February 20, 2014.  He had physical custody of the Children from June 17 to October 29, 2013, and he relinquished them to Velarde only when required by a court order. After the Children went back to Velarde, Correa called her every day to seek access to the Children, personally went to the house where he believed they were living to ask to see the Children, and sent Velarde and her parents multiple notarized letters requesting visitation and information on the Children's whereabouts.  He emailed the Children's school to determine whether they had transferred to another school, and he sent a member of his personal staff to the beach near their neighborhood to see if they were there.  When he could not find them, he filed a police complaint and arranged for a police officer to go to Velarde's parents' house to ask for the Children.  Throughout this time, he continued to pay the Children's health insurance and school tuition even though the Children had stopped attending, so that they would not lose their placements at the school.  The persistence with which Correa pursued his Children over several

months, despite not knowing their whereabouts, in no way supports a conclusion that Correa clearly and unequivocally intended to abandon his custody rights. Correa therefore was exercising his rights at the time of removal, and he has established a wrongful removal under the Hague Convention. At the same time, these facts demonstrate that Velarde has failed to establish the exception, under Article 13(a) of the Convention, for failure to exercise custody rights.

## III.     Article 13(b)

### A.     Grave Risk

Even where wrongful removal has been established, under Article 13(b) of the Hague Convention, the Court "is not bound to order the return of the child" if the respondent can establish that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b), 19 I.L.M. at 1502. The respondent must demonstrate that this exception applies by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). To avoid circumventing the underlying purpose of the Hague Convention, this exception must be construed narrowly. *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007). The narrow construction, however, should not give way to "the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation." *Id.* (citation and internal quotation marks omitted).

Although there is no clear definition of what constitutes "grave risk," the respondent "must show that the risk to the child is grave, not merely serious." *Friedrich*, 78 F.3d at 1068. The risk must be more than the trauma associated with uprooting and moving the child back to the country of habitual residence. *See id.* at 1068 ("A removing parent must not be allowed to abduct a child and then – when brought to court – complain that the child has grown used to the

20

surroundings to which they were abducted."); *see also Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000) ("[T]he harm must be something greater than would normally be expected on taking a child away from one parent and passing him to another." (citation and internal quotation marks omitted)).

Domestic abuse can provide a basis for a finding of grave risk. Certainly, sexual abuse of the child would constitute a grave risk of placing the child in an intolerable situation. *See Hague International Child Abduction Convention; Text and Legal Analysis*, U.S. Department of State, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986) ("An example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child."); *Simcox*, 511 F.3d at 606 (stating that the State Department's comments on the Hague Convention are afforded "great weight"). Significant physical and verbal abuse of a spouse and child can also establish a grave risk. *See, e.g., Simcox*, 511 F.3d at 598–99, 608–09 (finding grave risk arising from the father's verbal and physical abuse of the mother in the children's presence, as well as "frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and pulling [of] hair and ears" against the children); *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (finding evidence of grave risk sufficient to deny summary judgment where the father frequently and seriously beat, kicked, and choked the mother, verbally abused her, struck the child on several occasions, and threatened to kill the mother and the children).

Courts have found grave risk based on domestic abuse of the spouse in the presence of the children, even without abuse directed at the children themselves. In *Walsh*, the court found grave risk based on a long history of the father physically beating the mother, including in front of the children, as well as a history of fighting others, threatening to kill another, and a history of violating court orders. *Walsh*, 221 F.3d at 211, 219–20. Likewise, in *Baran v. Beaty*, 526 F.3d

21

1340, 1345–46 (11th Cir. 2008), the United States Court of Appeals for the Eleventh Circuit found grave risk where the father had verbally and physically abused the mother in the child's presence, and threatened to harm the child, but did not physically abuse the child. *Id.* at 1346. In such cases, courts have noted the psychological harm inflicted on the child witnessing the abuse of the parent and the increased risk that the child would be similarly abused. *See, e.g.*, *Walsh*, 221 F.3d at 220 (noting that "children are at an increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser").

Not every case involving abuse, however, presents a grave risk. In *Whallon v. Lynn*, 230 F.3d 450 (1st Cir. 2000), the court did not find grave risk where the father verbally abused the mother and an older child and, on one occasion, shoved the mother and threw a rock at her car, but did not physically or psychologically abuse the child at issue on the petition. *Id.* at 453, 460. Similarly, in *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374 (8th Cir. 1995), the father's physical, sexual, and verbal abuse of the mother was not enough to constitute grave risk where there was no evidence that the father abused the six-month-old child, since grave risk is concerned with whether the child would suffer upon return, not the parent. *Id.* at 376-77.

In this case, there is very little evidence that Correa physically abused Velarde or the Children – the only such instance being when Correa threw a book at J.G.C.V. for getting poor grades. Although physical abuse was present in the leading cases on grave risk, the Hague Convention specifically provides that the grave risk can be of "physical *or* psychological harm." Hague Convention art. 13(b), 19 I.L.M. at 1502 (emphasis added). Here, there was significant and unusual psychological abuse of both Velarde and the Children. Correa regularly made threats and verbally abusive statements to Velarde over a several-year period. Among the many examples, Correa called Velarde a "bitch," a "prostitute," and a "whore," often in the presence of

22

the Children.  After the separation, Correa wrote abusive emails and made at least one abusive phone call to Velarde in which he repeatedly called Velarde, her father, and her mother a variety of profane names such as "bitch," "whore," "bastard," and "son of bastard bitch."  *See, e.g.*, Trial Ex. 114.  On one notable occasion outside the family home, Correa shouted to Velarde, in the presence of the Children and loud enough for the neighbors to hear, that she was a "masturbator of kids" and that she "stuck her finger in the ass of the boy."  Trial 10:20:00 (Apr. 24, 2015). Such verbal abuse has been a contributing factor to a finding of grave risk.  *See, e.g.*, *Simcox*, 411 F.3 at 599 (considering calling mother vulgar names in front of the children as part of the grave risk analysis); *Van de Sande*, 431 F.3d at 569 (same).

Significantly, unlike in *Simcox*, *Van De Sande*, *Walsh*, or *Baran*, the Children not only heard some of Correa's verbal abuse of their mother, they were the direct recipients of it, and even more troubling, they were coerced into delivering sexually explicit insults and accusations directly to their mother and others.  When Correa had the Children living with him after the separation, he told the Children that their mother was a "prostitute," that she "wanted the penis to be stuck in her vagina and your grandmother is like that, too" and that "your mother has stuck her finger in your ass."  Vigo Test. (Direct) 78:20–21, Apr. 21, 2015.  Correa coached the Children to tell social workers that Velarde had touched him inappropriately.

On at least one occasion, Correa directed R.G.C.V. to call his mother a "dog" or a "bitch" over the telephone.  Vigo Test. (Direct) 75:7–15, 77:12–15, Apr. 21, 2015; *see Van de Sande*, 431 F.3d at 569 (father told child to call her mother an obscenity).  When he struggled to say the words, Correa ordered him to "tell her."  Vigo Test. (Direct) 75:14, Apr. 21, 2015.  On another occasion, he dictated to J.G.C.V. a message to Velarde, that the child wrote, stating that she had raped him, that her father is a "drunkard," that her mother is a "deceitful whore," that the

Children both "hate" her.  Correa also forced him to write that Correa would rather "kill himself," and that the Children "would rather die and go to Heaven as angels with uncle Guillermo," than have them go back to living with her.  Vigo Test. (Direct) 17:22–25, Apr. 23, 2015.  Both the act of compelling children to abuse their mother verbally and the reckless exposure of the Children to inappropriate sexual concepts at a young age take Correa's psychological abuse to a level beyond what is typically seen in grave risk cases.

Correa also repeatedly threatened to kill or harm Velarde.  Prior to the separation, he threatened to cut her face and "destroy" her, he stuck a knife in a table as a threat to her, and he told her directly that she "would live with a bullet in her head."  Trial 10:09:30 (Apr. 24, 2015). After the separation, he threatened to kill Velarde's parents in a verbal tirade over the telephone. He then offered to pay Vigo to shoot Velarde when she arrived to get physical custody of the Children in October 2013.  Because Correa owned a handgun, and Vigo carried a weapon for his security duties, there was more than an abstract chance that Correa would eventually follow through on such threats.  Even more troubling, Correa communicated his threats directly to the Children, even when their mother was not present, by bending a fork and stating that he would do the same to her, by telling them that he would use a Taser on her, and telling them that he would buy a silencer for his gun to use against their mother.

Of greatest concern was Correa's threat to harm the Children.  Prior to the separation, he threatened to Velarde that he would kill himself and the Children "if things go wrong."  Trial 10:04:55 (Apr. 24, 2015).  Later, he directly told the Children, "I will kill you both and then I will kill myself and we will all go together to heaven" with their late uncle.  Vigo Test. (Direct) 4:25–85:3, Apr. 21, 2015.  This same scenario was referenced in the letter that J.G.C.V. was forced to write to his mother.  Certainly, threats to kill the spouse, the child, or third parties are

significant factors in considering grave risk. *See, e.g.*, *Van De Sande*, 431 F.3d at 569 (finding grave risk where the father threatened to kill the children, kill the mother, and then kill "everybody"); *Walsh*, 221 F.3d at 209 (finding grave risk where the father was criminally charged with threatening to kill a neighbor); *Blondin v. Dubois*, 189 F.3d 240, 243 (2d Cir. 1999) (finding grave risk where the father twisted an electrical cord around the child's neck and threatened to kill the mother and child).

The gravity of these threats is heightened when viewed in the context of Correa's history of psychological and substance abuse issues. For several years, he drank alcohol excessively while taking prescription medications. Correa received psychiatric treatment from 2008 to 2010, saw a psychiatrist after Velarde left with the Children in 2012, then went to a rehabilitation facility after the Children returned to Velarde in October 2013. During this time period, he made several unsettling references to suicide and death. He expressed thoughts of suicide on multiple occasions, dating as far back as 2008 when Velarde found a note on their bed from Correa asking that he be buried in a handpicked suit, to 2012 when he threatened to throw himself from the fifth floor window, to the yearlong period when he threatened on more than one occasion to kill himself and the Children. He also unnecessarily and callously told R.G.C.V. that he was going to die from a fever. In an email dated June 19, 2013, Correa strangely indicated that he had received revelations of the impending death of family members of Velarde's friend, including the means by which they would die (a car accident, a heart problem, and cancer).

Thus, although this case involves little or no physical abuse, the magnitude of the psychological abuse is unique. The Children were not merely present during verbal abuse of their mother. They were subjected to direct statements from their father denigrating or threatening their mother, were forced to engage in verbal abuse of their mother, were required to

25

hear and repeat sexually explicit statements about their mother and her conduct, and they were directly threatened by their father with possible death. Dr. Munson diagnosed J.G.C.V. with severe post-traumatic stress disorder and persistent depressive disorder and found it likely (through a "rule out" determination) that R.G.C.V. also suffers from these conditions. Both have separation anxiety disorder. He opined that return of the Children to the father in Peru would present a grave risk of harm.

Viewed as a whole, the abuse of the Children here is at least as severe as that found in *Baran*, where the father had a history of a violent temper and alcohol abuse and there was repeated physical abuse of the mother, sometimes in the child's presence, as well as a threat to hurt the child, but there was no direct abuse of the child. *See Baran*, 526 F.3d at 1346. It is comparable to the abuse of the child in *Blondin*, where grave risk was found based on physical abuse of the mother in the child's presence and threats to kill the child, including with an electrical cord placed around her neck. *See Blondin*, 189 F.3d at 242–43. It is also significantly worse than the abuse in *Whallon* and *Nunez-Escudero*, where there was no grave risk found because there was little or no harm inflicted upon or in the presence of the child. *See Whallon*, 230 F.3d at 452–53, 460; *Nunez-Escudero*, 58 F.3d at 377. Thus, the Court finds that unless the situation has dramatically changed, there would be a grave risk of harm to the Children if they were returned to their father in Peru.

Correa claims that he stopped drinking on October 29, 2013, when Velarde took the Children back, and that he has been sober ever since. He testified that he had done a lot of harm to Velarde and the Children, he was ashamed to see his behavior laid out in such detail during the hearing, and he was deeply sorry for what he had done. Dr. Lefkowits, who evaluated Correa, did not diagnose him with any psychological disorder and concluded that his alcohol

abuse is in remission. Nevertheless, the Court cannot safely conclude that Correa's abusive conduct is in the past. First, as noted previously, Correa's testimony was internally inconsistent and defiant at times, such as when he denied past psychiatric treatment, and he did not present a uniform picture of someone who has acknowledged and corrected past misbehavior. Second, Dr. Leftkowits' evaluation was based on the information provided by Correa. Notably, Correa failed to inform Dr. Leftkowits that he had entered an in-patient rehabilitation center in 2013, that he had received prior psychiatric treatment, and that he had taken various medications. He did not tell Dr. Lefkowits that he had made threats to Velarde and the Children, such as the threat that Velarde would live with a "bullet in her head," which Correa has now admitted. Dr. Leftkowits appeared visibly surprised when presented with some of these facts. Moreover, both Dr. Munson and Dr. Lefkowits noted that the computerized analysis of Correa's raw test data gave indications that Correa may have presented himself as "being free of psychological problems in order to influence the outcome of the custody evaluation." Dr. Munson Test. (Direct) 24:17–22, Apr. 24, 2015; Dr. Lefkowits Test. (Cross) 13:9–15, Apr. 24, 2015. Finally, it is noteworthy that Correa has asserted once before, in an April 2013 email to Velarde, that he had been sober for a period of several months, only to continue abusing alcohol through at least October 2013.

Correa also points to the generally positive visitation sessions he has had with the Children in conjunction with the state court proceedings. These monitored sessions, however, do not provide a clear picture of how he would interact with the Children upon return to Peru. At present, in Peru, Correa would have temporary custody of the Children under the October 1, 2014 appeals court ruling, and there is currently a criminal complaint in Peru against Velarde, initiated by Correa, for removing the Children from Peru. Thus, upon return, the Children would likely reside with him, in the prior family residence, with final custody yet to be determined.

The situation would therefore be exactly the same as it was from June to October 2013, when Correa privately sought to manipulate the Children to build a case for permanent custody through accusations that Velarde neglected the Children and sexually abused them. It also presents the possibility that, if the Peruvian courts rule against him on permanent custody, Correa would be faced with the choice whether to relinquish the Children again, or carry out his prior threat that he would kill himself and the Children rather than lose them. Although it may be that Correa is fully rehabilitated and would not consider such drastic measures, the Court is mindful that the gravity of a risk not only involves the probability of the harm, "but also the magnitude of the harm if the probability materializes." *Van De Sande*, 431 F.3d at 570.

Other considerations give the Court further pause. During the time period after the Children were returned to Velarde, Correa was heard directing his attorney to "go ahead and pay whatever amount of bribe was needed" in relation to the legal proceedings on custody. A ledger of payments contains entries that could be read as relating to bribes.[5] This evidence is consistent with his earlier email statement to Velarde: "Thank God this world is moved by money." Trial Ex. 108, at 295. To the extent that there are indications that Correa is not committed to allowing the Peruvian legal system to resolve the custody dispute without inappropriate manipulation, it raises concerns whether that system will be able to protect the Children adequately. *Cf. Walsh*, 221 F.3d at 211 (finding that the father's propensity to disregard court orders increases the risk of harm to the child).

Based on all of these factors, the Court finds that there is clear and convincing evidence to support Velarde's argument for a grave risk exception. Because of the quantity and severity

---

[5] Because the testimony at trial and the ledger itself do not provide a clear basis to distinguish the legitimate payment of legal fees or court costs from illegal bribes, the Court declines to find specifically that the ledger conclusively establishes that Correa bribed government officials.

of psychological abuse that the Children witnessed, received, and were compelled to inflict on their mother, the Court finds that there is a grave risk that returning the Children to their father in Peru during the pendency of the custody proceedings would expose them to psychological harm or otherwise place them in an intolerable situation.

## B.   Undertakings

Where there is a finding of grave risk, courts are "not bound to order the return of the child." Hague Convention art. 13(b), 19 I.L.M. at 1502. Courts may nevertheless return a child if sufficient protection is afforded. *Simcox*, 511 F.3d at 605. To mitigate the risk, courts may impose a set of enforceable conditions on the return, known as "undertakings." "The undertakings approach allows courts to conduct an evaluation of the placement options and legal safeguards in the country of habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction." *Walsh*, 221 F.3d at 219. Undertakings may "accommodate [both] the interest in the child's welfare [and] the interests of the country of the child's habitual residence." *Van de Sande*, 431 F.3d at 571-72.

In offering guidance on the use of undertakings, the United States Department of State (the "State Department") has advised that they be narrowly drawn:

> Undertakings should be limited in scope and further the Convention's goal of ensuring the prompt return of the child to the jurisdiction of habitual residence, so that the jurisdiction can resolve the custody dispute. Undertakings that do more than this would appear questionable under the Convention, particularly when they address in great detail issues of custody, visitation, and maintenance.

*Danaipour v. McLarey*, 286 F.3d 1, 22 (1st Cir. 2002) (quoting Letter from Catherine W. Brown, Assistant Legal Adviser for Consular Affairs, United States Dep't of State, to Michael Nicholls, Lord Chancellor's Dep't, Child Abduction Unit, United Kingdom (Aug. 10, 1995) ("Brown Letter")). A court "must recognize the limits on its authority and must focus on the particular

situation of the child in question in order to determine if the undertakings will suffice to protect the child." *Id.* at 21. A court cannot require a parent to return to the country, nor can it require a foreign court or jurisdiction to enter a new order to enforce the undertakings. *See Simcox*, 511 F.3d at 610 (finding undertakings flawed because the mother cannot be forced to return and there were doubts as to the father's willingness to abide by the undertakings); *Danaipour*, 286 F.3d at 25 (concluding, in a case with credible sexual abuse allegations, that the district court had no authority to order a forensic evaluation in Sweden or to order the Swedish courts to consider the evaluation in the custody dispute). Undertakings are thus most effective when used only to preserve the status quo at the time prior to the wrongful removal. *Simcox*, 511 F.3d at 607.

The State Department has cautioned against using undertakings when one parent is protecting the child from abuse:

> If the requested state court is presented with unequivocal evidence that return would cause the child a "grave risk" of physical or psychological harm, however, then it would seem less appropriate for the court to enter extensive undertakings than to deny the return request. The development of extensive undertakings in such a context could embroil the court in the merits of the underlying custody issues and would tend to dilute the force of the Article 13(b) exception.

*Danaipour*, 286 F.3d at 25 (quoting the Brown Letter). Nevertheless, even where a district court has found grave risk arising from physical or psychological abuse, several Courts of Appeals have required district courts to consider undertakings prior to denying a petition. *See, e.g.*, *Simcox*, 511 F.3d at 610–11 (remanding for assessment of whether undertakings could be fashioned to allow for return); *Blondin*, 189 F.3d at 249–50 (after affirming finding of grave risk, remanding for consideration whether arrangements could be made with a third party custodian to allow for repatriation). *But see Baran*, 526 F.3d at 1351–52 (holding that upon a finding of grave risk the district court did not have to consider undertakings).

30

Although this case involves domestic abuse creating a grave risk of psychological harm to the Children, there is nevertheless a realistic possibility of return with undertakings. First, although the Court has found grave risk, particularly given the absence of sexual abuse or physical violence, the abuse is not so extreme as to foreclose the possibility of return with undertakings. *See Simcox*, 511 F.3d at 607–08 (distinguishing between extreme abuse, for which undertakings should not be considered, and "cases that fall somewhere in the middle," where undertakings could be considered). Second, unlike in many domestic violence cases, a return to the status quo before the removal would not necessarily return the Children to the abusive environment. Here, immediately prior to the removal, the Children were in the temporary custody of Velarde, at a location away from Correa and the original family home. Dr. Munson's opinion on grave risk was focused on the scenario of returning the Children "to their father in Peru," and he did not opine that the Children's presence in Peru in general would affirmatively trigger psychological harm. Dr. Munson Test. (Direct) 135:20–136:9, Apr. 23, 2015.

Third, because Velarde is Peruvian and her parents reside there, this case does not involve the scenario under which returning the children would, as a practical matter, require that the removing parent and children return to an abusive home and seek to navigate a court system foreign to them. *See, e.g., Blondin*, 189 F.3d at 249 (reversing district court's denial of undertakings even though the district court found that the mother's circumstances would necessarily have required her and the child to return to the father's home); *Baran*, 526 F.3d at 1344, 1352 (rejecting proposed undertaking that the child and the mother, an American citizen, return to Australia to live in the abuser's home or the abuser's sister's home). During the two periods when Velarde had custody of the Children in Peru, immediately following the separation (December 2012 to June 2013) and immediately prior to the removal (October 2013 to February

2014), it was demonstrated that Velarde and her family have both the support network and financial resources to care for the Children away from Correa. At various times they stayed at Velarde's parents' home, Velarde's parents' beach house, and a "safe house" rented by Velarde. Even if Velarde were to choose not to return, the Children presumably could stay with their maternal grandparents.

Moreover, Velarde and her family have demonstrated that they have the resources and sophistication to litigate the custody proceedings in the Peruvian courts to their resolution. Prior to her departure from Peru, Velarde had retained an attorney and had vigorously litigated the custody dispute. Just as Correa had engaged in dubious tactics such as sending notarized letters claiming that Velarde was neglecting the Children by not visiting them at his house, Velarde engaged in similar tactics by filing at least six police complaints alleging that Correa had not attempted to visit the Children, at a time when she had taken the Children to a "safe house" to avoid contact with him. Then when Vigo approached Velarde's family with relevant information, the Velardes had the resources to pay for an attorney for Vigo and to hire him as an employee for the duration of the custody proceedings in order to ensure his availability to testify. Although there is some evidence that Correa has sought to use his family's financial resources to influence the outcome of the proceedings, the reality is that up until her departure, Velarde, not Correa, had prevailed at each stage of the *habeas corpus* proceedings, had obtained the *no innovar* order, and had thus secured temporary custody.

Finally, based on the series of visitation sessions in Maryland between Correa and the Children since January 2015, there is reason to believe that supervised visitation in Peru, if ordered by a Peruvian court during the pendency of custody proceedings, would not jeopardize the Children's safety. Thus, a return to the status quo immediately prior to the removal appears

to be a viable scenario that would accomplish both the return of the Children in compliance with the Hague Convention and the safety of the Children. In his submission on undertakings, Correa proposed such a plan. He would agree to have the Children return to Peru and remain in the custody of Velarde or her designee, at her parents' home or some other suitable residence. He has agreed to pay relocation expenses and living expenses for the duration of the custody proceedings.

The problem is that, because of Correa's post-removal litigation activities, the current legal landscape in Peru is incompatible with this return scenario. At the present time, Correa has a temporary custody order, entered in October 2014, and there is currently a criminal investigation, complaint, or charge against Velarde for leaving Peru with the Children without his consent. No order of this Court can supersede the existing temporary custody order in favor of Correa or prevent criminal charges from proceeding against Velarde. So upon return, Correa would have custody of the Children under Peruvian law, and if Velarde were to return with the Children and be arrested on criminal charges, the likelihood that the Children would be sent to live with Correa during the pendency of custody proceedings would increase.

Although Correa has proposed that he would promise not to seek enforcement of the Peruvian temporary custody order and would abstain from participating in the criminal proceedings as an aggrieved party, because undertakings are generally not enforceable in the country of habitual residence, no promise or agreement made by Correa before this Court could be enforced in Peru.[6] Given this reality, the current proposal is inadequate. *See Simcox*, 511

---

[6] Correa has also proposed as an undertaking that he would agree to refrain from seeking to pursue criminal charges against Velarde in the United States for immigration violations. The fact that he has apparently been considering such an action creates an additional cause for concern relating to the return of the Children, as it indicates an intention to continue to pursue

F.3d at 606 (stating that the party offering the undertakings bears the burden of proof on their effectiveness).

If, however, Correa can arrange to have the temporary custody order vacated, so that the underlying temporary custody order in favor of Velarde is reinstated, and if he can arrange to have the criminal charges against Velarde dismissed or the investigation closed, the legal landscape would return to the status quo at the time of the removal.  Although there is uncertainty whether such steps can be arranged, the fact that Correa initiated those proceedings suggests that it is possible.  At that point, the Court would be prepared to order the return of the Children to Peru, at Correa's expense, to reside with Velarde, her parents, or another third party custodian designated by Velarde, at a location selected by Velarde, during the pendency of the custody proceedings.  Any visitation or other arrangements for the time period during which the custody proceedings are pending would most appropriately be addressed by the Peruvian courts.

If these pre-conditions are met, the Children would be placed in an environment that has been previously shown to be safe, and the case would return to the status quo at the time of the wrongful removal.  Although this arrangement does require some action to undo what Correa has wrought, it would advance international comity to a much greater degree than the alternative, which is to deny the Petition outright.  If these pre-conditions cannot be met, the Court will not order the return of the Children, pursuant to Article 13(b).

## IV.    Article 20

Under Article 20 of the Hague Convention, the return of a child may be refused if the return "would not be permitted by the fundamental principles of the [United States] relating to the protection of human rights and fundamental freedoms."  Hague Convention art. 20, 19 I.L.M.

---

scorched earth tactics to eliminate the mother as a possible custodian during the pendency of the custody proceedings.

at 1503. This exception is "invoked on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." *See Hague International Child Abduction Convention; Text and Legal Analysis*, U.S. Department of State, 51 Fed. Reg. at 10,510. This is an extremely high standard. Indeed, it appears that no American court has ever applied this exception. Regardless, for the reasons stated above in concluding that the Children may safely return under certain conditions, the Court finds that their return would not "shock the conscience" or be a violation of human rights or fundamental freedoms.

## CONCLUSION

For the foregoing reasons, and as stated in a separate Order, the Petition is CONDITIONALLY GRANTED. Correa has shown by a preponderance of the evidence that Velarde wrongfully removed the Children from Peru. Velarde, however, has demonstrated by clear and convincing evidence that returning the Children will place them at grave risk of psychological harm. Nevertheless, the Court will order the return of the Children, provided that Correa provides proof within 30 days that the following pre-conditions, which would reinstate the status quo at the time of the wrongful removal, have been satisfied:

1.   The October 2014 Peruvian appeals court order of temporary custody in favor of Correa has been vacated, and the underlying temporary custody order in favor of Velarde has been reinstated;

2.   All pending criminal complaints, investigations, or charges in Peru against Velarde, initiated by or with the assistance of Correa, have been dismissed or closed; and

3.   Correa agrees in writing to the undertakings listed in the accompanying Order.

If these pre-conditions are satisfied, the Court will issue a Final Order certifying that the pre-conditions have been met, mandating compliance with the listed undertakings, and ordering the return of the Children to Peru.

Date: May 20, 2015

THEODORE D. CHUANG
United States District Judge